Good morning, Your Honors. May it please the Court. My name is Max Rudy, and I represent the appellant in this case, Christopher Hardy. We're asking the Court to vacate the sentence in this case and remand for a new sentencing hearing because the Court erroneously applied 2D1.1B13, the four-level enhancement under that guideline. The issue before the Court is whether the appearance of the pill alone by itself supports the four-level enhancement that was applied in this case. Mr. Hardy argues that it does not. 2D1.1B13 subsection A, that's the four-level enhancement, requires the knowing misrepresentation or the knowing marketing of a substance containing fentanyl as another substance. So, what if he sold these previously to others? And, you know, it's sort of similar. You think it's heart medicine, but it turns out to be fentanyl. Wouldn't that be marketing by definition? I mean, if he actually said, here are the pills, you know, isn't that enough? Especially under a recent case of, what is it, Salinas or something? Yeah. Yes, Your Honor. I think that there are two parts to the question. The first part is you had presented a hypothetical where the pill was handed to someone. That wasn't what happened here. I'm not sure that that's true, but we'll talk about that in a second. Yeah. Absolutely, Your Honor. So, I think that a key factor in the hypothetical was that the pill was handed to someone else. I think that the other part of Your Honor's question was the Salinas case. And I think that with Salinas, there are two things that distinguish Salinas from Mr. Hardy's case. The first is the mens rea requirement. Salinas applied 2D1.1B13B, which has a lower mens rea, which is the willful blindness or the conscious avoidance of knowledge. Mr. Hardy's case requires the higher mens rea of knowing. The other difference between Salinas and Mr. Hardy's case is that in Salinas, there was a significantly greater amount of information available about the pills that Mr. Salinas was distributing. There was an officer that testified, and he provided a lot of information to the court about those pills, how they were manufactured. There were 16 pounds of fentanyl, almost 50,000 pills. They were made to look like, quote, the most popular generic oxycodone pill sold in the United States. The officer talked about the markings of a domestic pharmacy in the United States. Importantly, he talked about how that appearance led customers to believe that they were, quote, safe because they were made in the United States. But these are the same pills. And on the point, so I think in a lot of ways, the parties are talking past each other here. I just wanna ask you, there's a, in response to the objection, I believe, in the PSR, the probation officer came back and said this. The defendant acknowledged he was aware the pill had M30 markings. He knew the pills contained fentanyl, and this is the key phrase, and he sold the pills to other individuals. So that hypothetical I was posing, at least according to what the probation officer said, is actually the real deal. Because then the district court adopted the pre-sentence investigation report without change. So my understanding, maybe you can tell me I'm wrong, but my understanding is you actually have to argue that that is not enough to constitute marketing. If I can just interject, unless you objected to that fact. Right, right, exactly. What Mr. Hardy objected to was that knowing that he was marketing them as another substance. And so, Your Honor, you are correct. The specific objection, Mr. Hardy admits that he knew that they were fentanyl, and he admitted that he sold him. The primary argument below at the sentencing hearing was that everybody, that he knew that they were fentanyl, and everybody knew that they were fentanyl. And that he sold them to other individuals, which I presume was before this particular case. I just want to be sure about that. That's correct. The pills that he was stocked with during this particular traffic stop, no one ever saw them, they were never sold. But on other occasions, he did sell pills. We have even less information about how those looked, but I absolutely understand. If I understand your argument, the key question here, and the thing that he objected to and denied, is that he knew that blue pills marked 90 were purportedly something else. Yes, that is the key to Mr. Hardy's objection. And that's what you're saying is missing in the evidentiary requirement, right? That is correct. There was no evidence before the trial court that Mr. Hardy knew that the M30 markings meant anything other than fentanyl. Which I think is a different scenario than what subsection A tries to get at. Which is individuals that are knowingly trying to mislead and deceive people, they are what the guidelines call the most culpable. Then you have subsection B, which gets at people who have the pills that look like a medication, but they're willfully blind to whether or not they contain fentanyl. Subsection B there at the time of this sentencing, or no? It was, Your Honor. The sentencing was after November 1st of last year. It was brand new. It was not what was recommended in the PSIR, and it was not what the court considered or applied. But I think that that distinction is important when we're looking at what kind of conduct the Sentencing Commission was trying to get at with the two different subsections. But I think that Mr. Hardy is- You don't think, sorry to interrupt, but you don't think Salinas, I understood you to be making both the Actus Reus and the mens rea argument. And I think the Actus Reus argument may go away with what we just discussed, but the mens rea argument is live. But Salinas is about the mens rea, and I realize it was a different provision, but you still think Salinas doesn't provide us any guidance on the mens rea issue we're talking about now? I think it can provide guidance, but I don't think that it's just positive. I think that one of the key distinctions is that Salinas has a lower mens rea, but in that case there was more evidence. And I think that we have the reverse with Mr. Hardy's, the specific facts in Mr. Hardy's case, we have that higher level of mens rea, and we have less information about the medications, the manufacturing of those medications, and how they were perceived. So I think that, again, like I said, I don't think Salinas is just positive, but I think that it can provide some guidance. If the information, if that was what was required to get that level two, then we would need to have at least that much, if not more, in order to get the more culpable mens rea. And what's missing here, in your view, is he knew. None of these things say, from the probation officer, he knew. And I don't know if the probation officer could actually say that unless he confessed, but that's the problem. Yes, correct, Your Honor, that there's no evidence in the PSA or before the court that Mr. Hardy knew that M30s, to some people, meant oxycodone. To Mr. Hardy, they meant fentanyl. Will you remind me what the district court said about that particular issue? I know the government hadn't presented evidence, but did the district court wrestle with that specific issue that you're arguing on appeal, his knowledge or not? How did the court analyze that? I don't believe that the court did provide a lot of analysis into whether or not Mr. Hardy knew whether these ever were oxycodone. The district court focused on the appearance of the pill and that they were sold. I believe that that's how the emphasis of the district court. Your Honor, if there's no other questions, I'd like to reserve the remainder of my time. Very well. Thank you. Good morning. My name is Megan Healy on behalf of the United States. The government respectfully asks this court to affirm the judgment below. I'd like to start with where the court left off. With the argument that Mr. Hardy did not know that M30 meant oxycodone. As I review the record, I don't believe that argument was made before. The parties effectively conceded the knowledge aspect of this and really focused on sentencing. And I direct you to pages five through 11 of the sentencing transcript that the issue was whether he knowingly marketed the pills that were in his possession. The government took the position that he didn't market. We did take that position below. I would note that... So at both sides you're saying making new arguments on appeal. No. I get it that you're defending the judgment below, but I mean it... Right, but just I want to provide a little bit more context on that, Judge, is that between when we entered into this plea agreement sometime in early 2024 and the sentencing in November 2024, at that time there was really, during that time there was kind of a dearth of authority on what this meant. I identified nine circuit-level decisions that have gotten to the substance of this. Six of those nine came out this year. In addition, Salinas came out in March. So there's been intervening law, a change of authority, and the prevailing, as I read it, the prevailing wave among the circuits is that those who have addressed the marketing, which is a smaller subset of that nine, is finding that possession of pills that are marked as legitimate oxycodone pills, but are really fentanyl pills, satisfies the marketing requirements. And also, in this court's law, absent a provision in a plea agreement governing our appellate position, we are free to take a legal position in support of the district court's judgment. And in this case, it is also the department's position that the district court was correct here. Let me ask you, you say the argument wasn't made below, and that'll be factual, but is there any evidence whatsoever that he knew blue pills marked M30 constituted some other substance other than fentanyl? I don't see anything in the record. Nothing in the record comes to mind for me on that point. But also, the knowledge was focused on does he know that this is another substance other than, but it's really fentanyl? And so, by marking a pill, and we made this argument in our brief, that marking a pill in a way that signals that it is some kind of pharmaceutical. Maybe generally, that may be generally out in the public, but don't you think under this guideline, the government would have to prove, if it's objected to, that he knew that these markings meant that it was something else other than fentanyl? Again, Your Honor, that was not the argument below.  And so... And we'll figure that out. Of course. That's either gonna be true or not true, and we'll ask counsel. I think that's, based on our arguments in the brief, the knowledge and the cases, I would say, around the circuits focus on the knowledge that they knew it was fentanyl. That's been the entire focus of the knowledge. And as to your specific question, I think that it... That's required of a conviction, right? You have to know it's an illegal substance. Yes. Fentanyl. This is like an enhancement in the guidelines, so it seems to me you gotta know more, and I think what the guideline's getting at is you know you're counterfeiting something else, and that's what I think may be missing here, if it was objected to and argued. Yes, Your Honor, and it's... I would say that, based on the fact that it was stamped to look like a legitimate pharmaceutical, there is certain, and he knows that it's not a legitimate pharmaceutical, that is a reasonable inference for the district court to make that he knows it is a different substance. I think you can make that without some evidence that... I mean, in the absence of any evidence, he could, we could presume that he knows a blue pill marked M30 is fentanyl. And I think... That's widely known. I mean, without any evidence... And that's still legal. Yeah. One, I think there may be something in the sentencing transcript on that M30 pills that's not the way that fentanyl is marked. There may be something in the transcript on that. Well, I believe that, generally speaking. Yes. And I think probably the agent testified to that, and that's probably commonly known, but can we use the common knowledge to impute to this particular defendant for this four-level enhancement? Well, Your Honor, I would say that what is commonly known is, and Ms. Rudy characterized it as everyone, I'd say, let's look at, step back, what is everyone? Everyone is people who are working in this line of work, not the general public. It's, as she said, her prosecutors, her client, maybe first-line distributors. But stepping back and looking at this reasonable inference that it's marked something that it isn't, the goal and purpose of this enhancement is the risk to downline consumers. That's why the enhancement exists. It's spelled out in the reason that it's the fear of the extreme potency of fentanyl. And it may be that the first-line buyer knows, because these are the next distributors around. He sold them to sub-distributors here. It's the concern in the enhancement is that by selling pills that are marked as legit substances, you run the risk of a serious overdose, overdose resulting in death of a downstream buyer who looks at that and doesn't know that it is fentanyl. But he has to know. I mean, he has to know that he's doing that. Because if he looks at this and says, oh, this is 30 milligrams of fentanyl, okay, I understand that, and you're selling it as 30 milligrams of fentanyl, then you have it misrepresented if it is indeed 30 milligrams of fentanyl. I think you could say that as to the first-line buyer. Yes, absolutely. But the purpose and the recent case out of the Sixth Circuit, the Rodovic case, talks about it's really, I'm sorry, not Rodovic, the Matthews case, it's really not that first-line buyer that we're worried about. It's the ones farther down the stream. And that is in line with the reason for amendment given by the Sentencing Commission. So you're saying even if he doesn't know and he's giving it to another buyer, the fact that it eventually could be misrepresented to somebody down the line who may not know that he's liable, it's kind of like, it's almost strict liability, though, isn't it? It's the, no, it's not, because he has to knowingly mark it and he has to know that it is fentanyl, not something else. So it's not strict liability. I'd like to step back to a couple questions you were asking, Judge Strauss, on the selling of the pills here. In this case, I think the facts are very similar to the Radovich case from the Sixth Circuit from about a month ago. I filed a 28-J letter on this. And in that case, like in this case, the specific pills that were in the defendant's possession, there was not an indication that those pills, the ones that he was caught with, were sold to other individuals. But there had been previous, there had been, in some instances, some previous sales. And that's the case here, is he was convicted of, he pleaded guilty to a conspiracy count, which involved four previous distributions of pills from, it appears from the record, the same source in Minnesota. I think it's a reasonable inference for the court to make that he's getting the pills from the same sources or the same pills. That would be what would support what the PSR writer said in the addendum about that he sold the pills to other individuals. And she also noted that the pills sold throughout the course of the conspiracy. So I just wanted to point that out. And that takes care of the actus reus, I think, right? I think so. But I think, as Ms. Rudy framed the issue, was does appearance alone support the enhancement without a distribution? And I don't think that's quite the facts here. I think that was, looking at Salinas, I think that more was the facts in Salinas, where, like this case, it arose from a traffic stop. He had about 50,000 fentanyl pills. And there was, as I read the record in that case, it doesn't look like there was ever any distribution there. The defendant argued that he did not represent or market the pills. Of course, this is in the context of the two-level enhancement. But representing and marketing should be applied equally across both within the same, the concept of what they mean applied both in the same guideline. And the court there couldn't affirm unless it found that representation and marketing was satisfied there. And all they had there was that he had the M30 pills that were made to look like legitimate oxy pills. And that it appears, as I read the case, that that was found sufficient to satisfy the marketing aspect here. Why isn't this, just to go back to Salinas really quickly, why isn't this just a willful blindness case? Why is this ultimately a knowledge case? What I'm having a hard time with is what the difference is, based on the government's argument here between the two. Okay, I would say that this is a knowledge case because as I look at the cases from around the circuit, the ones that focus on knowledge, they are all focusing on did he know it was fentanyl? So the Hedewa case from the Seventh Circuit that was cited in Ms. Rudy's brief. There's also a Curry case from the 11th from this year. Allen from the 6th in 2022. Strong from the 4th in 2025. It's all focused on did the defendant know in the context of this guideline that the substance that he was handing out actually had fentanyl in it? That's been the focus of the inquiry across the circuit. You don't think the knowingly goes at all to the misrepresentation or that the knowing doesn't go at all to market it as another substance? I think the knowingly goes to the- Even though knowingly is right before each of those phrases, not before the fentanyl part. Yes, it's knowingly misrepresented, knowingly marketed. It's marketed as another substance, a mixture of substance containing fentanyl. So the inquiries have all been focused on did the defendant know it was fentanyl? And I have not seen a case that they have found that he has knowingly marketed know what the other substance was. That's not been how the law has been developing in this very fast-moving developing area. Just one quick question. So if, I think what you're saying then is if he thought it was oxycodone and there was evidence he thought it was oxycodone, had no idea it was fentanyl, that would be the willful blindness situation in Salinas because you really aren't looking. The real question, the question whether it's fentanyl is sort of, you know, that's all you need to know. Yes. For knowing. Yes, exactly. For the, it's that you knew it was fentanyl and you were marketing it as something other than fentanyl. Well, okay. But if your marketing is something other than, and that's my question, where's the evidence of that? That it is stamped as a legitimately manufactured pharmaceutical oxycodone pill. You think that fact alone is enough? He doesn't have to know that M30 generally means oxycodone. Yes, Your Honor. I'd say that that's enough, that it's marked as something other than the fentanyl that he knows it is because he knows they're counterfeit pills here. Okay. Thank you very much. Thank you.  Ms. Rudy, while you're coming up, can you address whether the argument was made below that he had to know that this was some other substance or was being, that it was made to look like some other substance? Was that argument made to the district court?  Your Honor, the argument that was made below was that Mr. Hardy always believed that they were fentanyl, always held them out to be fentanyl. And so, Your Honor, I would argue that, yes, the argument essentially at the trial court was that all we were ever talking about was fentanyl. We were never talking about anybody believing that they were oxycodone. There was, in the sentencing memorandum and mentioned at the sentencing hearing, references to basically the pill identification resources talking, illustrated that other oxycodone pills do not look like, they're not necessarily all blue, they're not all necessarily marked M30s, and that there were actually other pills that were not oxycodone that do resemble or have that same general description. Can I just ask you also, is that argument made in the brief today? Because I interpret it as the actus reus being your main argument. We've talked about that. But this precise thing that we're caught up on, is that in the brief? And if so, do you remember where? Your Honor, I believe that the argument had been both that there was, that I've been making, has been both that they had never been marketed. And that also, that had they been marketed, they were never marketed as something other than fentanyl. So both. And that's the knowledge, and tying it to the knowledge requirement. That second part ties into the knowledge, Your Honor. I see that I am out of my time. Thank you, Your Honor. Very well, thank you. The court wishes to thank both counsel for their appearance. Interesting issue, we'll have to figure it out. And we'll issue an opinion in due course. That complete our docket for the week? It does, Your Honor. Court will be in recess.